# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERRIE MILLER, | ) 1:04-cv-5856-SMS |
| | ) |
| Plaintiff, | ) DECISION AND ORDER DENYING |
| | ) PLAINTIFF'S SOCIAL SECURITY |
| | ) COMPLAINT (DOC. 1) |
| v. | ) |
| | ) ORDER DIRECTING THE ENTRY OF |
| JO ANNE B. BARNHART, | ) JUDGMENT FOR DEFENDANT JO ANNE B. |
| Commissioner of Social | ) BARNHART, COMMISSIONER OF SOCIAL |
| Security, | ) SECURITY, AND AGAINST PLAINTIFF |
| | ) SHERRIE MILLER |
| Defendant. | ) |
| | ) |
| _____ | ) |

Plaintiff is represented by counsel and is proceeding in forma pauperis with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for a period of disability, disability insurance benefits (DIB), and supplemental security income (SSI) benefits under Titles II and XVI of the Social Security Act (Act). Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the Magistrate Judge to conduct all proceedings in this matter, including

ordering the entry of final judgment.[1] The matter is currently

before the Court on the parties' briefs, which have been

submitted without oral argument to the Honorable Sandra M.

Snyder, United States Magistrate Judge.

<u>PRIOR PROCEEDINGS</u>

On June 12, 2001, Plaintiff applied for a period of

disability and disability insurance benefits, and on August 16,

2001, Plaintiff applied for SSI benefits, alleging disability

beginning on May 30, 2000, due to depressive disorder and alcohol

dependence. (A.R. 285-87, 93-95, 102.) Plaintiff's claim was

denied initially and on reconsideration. (<u>Id.</u> at 57-58, 282-83.)

Plaintiff requested a hearing before an administrative law judge

(ALJ) of the Social Security Administration (SSA). On April 30,

2003, Plaintiff appeared with an attorney and testified before

the ALJ, the Honorable James N. Baker. On September 12, 2003, the

ALJ denied Plaintiff's application for benefits. (<u>Id.</u> at 31-44.)

Plaintiff appealed the ALJ's decision to the Appeals Council, but

on April 30, 2004, the Appeals Council denied Plaintiff's the

request for review. (<u>Id.</u> at 6-9.)

On June 16, 2004, Plaintiff filed the complaint in the

instant action. Defendant filed the administrative record on

October 21, 2004. On February 16, 2005, Plaintiff filed an

opening brief. On April 18, 2005, Defendant filed a brief in

opposition. On April 21, 2005, Plaintiff filed a reply brief.

<u>ADMINISTRATIVE FINDINGS</u>

The ALJ considered whether Plaintiff was disabled due to

---

[1] District Judge Anthony W. Ishii assigned the case to the undersigned Magistrate Judge on November 16, 2004.

2

arthritis, depression, and anxiety, and he found that Plaintiff
suffered impairments of depression and anxiety that were not
severe and did not meet or medically equal a listed impairment,
including 12.04 or 12.09; she did not have a severe impairment
relative to drug addiction and alcoholism or bronchitis; she
retained the residual functional capacity (RFC) to perform
unskilled work at all exertional levels, with mild restrictions
of activities of daily living, mild difficulties in maintaining
social functioning, mild deficiencies of concentration,
persistence or pace, and no indication that she had ever had an
episode of decompensation of extended duration except for drug
relapses. Plaintiff's subjective complaints and those of her
landlord and friend were not totally credible. Plaintiff was
unable to perform her past relevant work of bartender; she was a
person closely approaching advanced age at the time of decision
and a younger individual at the time of onset who had the
equivalent or more than a high school education but no
transferable skills. Her non-exertional limitation of performing
unskilled work did not preclude or significantly compromise her
ability to perform work at all exertional levels; using § 204.00
of the medical-vocational guidelines as a framework for the
decision, the ALJ concluded that there were a significant number
of jobs in the national economy that Plaintiff could perform
given her age, education, past relevant work experience, and RFC.
Accordingly, she was not disabled at any time through the date of
decision. (A.R. 31-43.)

<u>ISSUES PRESENTED</u>

1) Whether the ALJ stated clear and convincing reasons for

3

discrediting Plaintiff's subjective complaints;

2) Whether the ALJ stated adequate reasons for rejecting the credibility of third parties Cook and Marquez;

3) Whether the ALJ's rejection of the opinion of consulting examiner Dr. House was supported by an adequate statement of reasons that in turn were supported by substantial evidence;

4) Whether substantial evidence supported the ALJ's findings concerning Plaintiff's headaches;

5) Whether substantial evidence supported the ALJ's rejection of the opinion of treating physician Dr. Daley;

6) Whether the ALJ failed to consider the collective impact of all Plaintiff's impairments;

7) Whether the ALJ erred by relying on the grids when he found significant non-exertional impairments; and

8) Whether benefits should be awarded, or the matter should be remanded for further development of the facts, consideration of Plaintiff's impairments, and testimony by a vocational expert (VE).

<u>FACTS</u>

I. <u>Plaintiff's Testimony at the Hearing</u>

At the April 2003 hearing before the ALJ, Plaintiff, born on April 11, 1953, testified that she was fifty years old. She had three years of college and had obtained her GED when she was thirty-two. She had worked as a bartender for twenty-seven years (Tr. 48). She reported that her arm was starting to deform from arthritis, her hands became numb when used any length of time, and her right legs had varicose veins which for a few months had precluded standing for more than fifteen minutes, although she

4

could sit for a couple of hours and walk for a half a mile. She had constant suicidal feelings, insomnia, lack of self-esteem, fatigue, mood swings, difficulty interacting with others, and constant headaches (although they did not obstruct her sleep), and she cried all the time, although she had not attempted suicide since an overdose in 1986 (Tr. 47-54). She was taking Ibuprofen and Prozac (Tr. 54). She testified that she was supposed to be hospitalized for suicidal problems in March 2003, but she did not tell the truth or return to the hospital because she had no one to watch her dog (Tr. 51). She had a driver's license and lived on the street because she could not pay rent. For the last six months she had started getting really angry and once threw something at her boyfriend; she tried not to be around people (Tr. 52-52.) She was supposed to see a psychiatrist, but when she went, they wanted money, or they wanted her driver's license or some identification that she did not have, so the only mental health care she had received was at Fable Center.[2] (Tr. 54-55.)

II. <u>Medical History</u>

Plaintiff fainted and hit her head and right arm while working as a bartender in May 2000 (Tr. 166). She complained of blurred vision and headache (Tr. 173). She had hypertension. (Tr. 174.) A CT scan of the head taken June 3, 2000, revealed no intracranial abnormality but evidence of ethmoid sinusitis; her headaches were then intermittent. (Tr. 176-77.) A treating source at the Health Services Agency described Plaintiff's fainting

[2] The reference may be to the Stanislaus Behavioral Health Center.

spell as a syncopal episode in context of increased stress and anxiety and alcohol consumption (Tr. 233). Paxil prescribed in September 2000 provided Plaintiff some relief, and she was prescribed medication for insomnia (Tr. 228, 231-232). After Plaintiff was referred to another practitioner to discuss her depression as well as job resources, she was started on a new medication for her depression and noted improvement (Tr. 227, 229). In 2001, Plaintiff was assessed with fatigue secondary to her depression, bronchitis and ethmoid sinusitis (Tr. 176, 225-226).

In February 2001, Plaintiff was admitted for four days to the Stanislaus Behavioral Health Center, where she admitted that she had started to use methamphetamine, her self-described "drug of choice," the previous day after reportedly having been clean or sober since 1991 (Tr. 197). She reported that she drank occasionally but did not feel that it was a problem for her. She was alert and oriented with normal speech, linear and coherent thought process, and fair judgment and insight. She interacted freely and constructively with staff and other patients, was compliant and productive in group programs, and reluctant to use medications because they slowed her down; she accepted a two-week supply of Inderal. She had discontinued Paxil because she felt it made her feel too tired. Upon discharge, she was diagnosed as depressive disorder not otherwise specified and alcohol dependence with history of substance abuse and anxiety and a GAF of 28/28. She was noted to be "substantially improved, in good spirits, and motivated to return to her work situation." She was to follow up with counseling. (Tr. 196-99).

Psychologist Charles House performed a comprehensive psychological evaluation of Plaintiff in September 2001. Plaintiff denied use of drugs and admitted to occasional consumption of beer. Plaintiff did not take her Prozac and Trazodone as prescribed by her family doctor because she lacked the money to pay for medications. Plaintiff's speech was normal and productive, with appropriate verbalization and concrete narrative. She had linear stream of mental activity, organized thinking, and depressed thought content. Her mood was markedly depressed. A mini-mental status exam resulted in a score of twenty-six out of thirty, reflecting intact cognitive functioning with no evidence of impairment in memory, concentration, or attention. She exhibited good insight into her problems and good concentration and attention; she was able to maintain good concentration, persistence, and pace. Her intellectual level was average without evidence of a significant cognitive impairment or disorder of thought. Memory functions were intact for immediate, recent, and remote events. Her problem-solving skills were impaired in an unspecified manner. Psychological correlates of anhedonia were present. The diagnosis was depressive disorder, not otherwise specified, marked, with suicidal ideation and anhedonia; polysubstance abuse disorder in partial remission according to Plaintiff; and her GAF was 50. Dr. House found that due to her depressive disorder and polysubstance abuse disorder, Plaintiff would have difficulty performing simple and repetitive tasks, accepting instructions and supervision, interacting with others, or maintaining regular attendance without significant disruptions in the workplace. He concluded that Plaintiff was

unlikely to improve within a year without aggressive psychiatric
intervention. (Tr. 200-06).

On October 29, 2001, Plaintiff was evaluated at Stanislaus
County Behavioral Health and Recovery Services upon her complaint
of needing to get back on some kind of medication because she
could not sleep. She reported that she had been clean from
methamphetamines for ten years but in April and May used crank;
she had not used alcohol for one year. She denied hallucinations
or delusions, her stream of thought was linear, her mood and
affect were somewhat sad and labile, impulse control fair,
intelligence average, and judgment and insight limited. She was
oriented. The diagnosis was adjustment disorder with depressed
mood, alcohol induced mood disorder, and borderline personality
disorder traits, with a GAF of 50. (Tr. 279-81.)

In October 2001, state agency psychiatrist Lon Gottschalk,
M.D., reviewed Plaintiff's medical records and Dr. House's report
in connection with Plaintiff's organic mental disorder (change in
personality, disturbance in mood, and emotional lability),
impairment in impulse control, affective disorder (depression not
otherwise specified), and substance addiction disorder. He
diagnosed polysubstance (drug and alcohol) abuse, and depression
not otherwise specified, caused and/or exacerbated by drug and
alcohol abuse. (Tr. 223.) He assessed mild restriction of
activities of daily living, but marked difficulties in
maintaining social functioning, maintaining concentration,
persistence, or pace, and three repeated episodes of
decompensation. (Tr. 207-23.) However, he further opined that if
Plaintiff were free of drugs and alcohol for a year, her only

significant limitations were insignificant to moderate limitation of ability to maintain attention and concentration for extended periods, ability to work in coordination with or proximity to others without being distracted by them, complete a normal day and week and perform at a consistent pace, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (A.R. 207-08.) He noted the report of contact of October 23, 2001, with Ms. Bambi Marquez, a realtor who sold Plaintiff's home and with whom Plaintiff had lived since August 2000. Marquez indicated that Plaintiff used a $42,000.00 profit from the sale of her house for gambling, heavy drinking, and probably methamphetamines, resulting in Plaintiff's eviction on September 2, 2001.

Dr. Gottschalk noted amphetamine involvement in Plaintiff's hospitalization of three days in February 2001 and the substantial improvement caused by four days without drugs even with no antidepressants. Even though Plaintiff had significant depression in September 2001, drug abuse and alcohol were severe problems at the time. He concluded that the report of February 22, 2001, upon Plaintiff's hospital discharge deserved weight. He concluded that if Plaintiff were drug or alcohol-free, she could perform simple, repetitive tasks or more, carry out moderately complex instructions, respond appropriately to supervision, coworkers, and the public, interact with others, and adapt reasonably to change in the workplace (Tr. 207-23, 207-209). Dr. Gottschalk discounted examining psychologist Dr. House's restrictive prognosis because, according to Ms. Marquez,

9

Plaintiff had been using drugs and alcohol near the time of Dr. House's examination (Tr. 222-223, 248, 251). Dr. Gottschalk's opinion that Plaintiff was quite functional was based in part on the demonstrable improvements to her mental state after only four days of abstinence and treatment at the Stanislaus Behavioral Health Center (Tr. 222-23).

Neurologist Daniel R. Katzenberg, M.D., performed a full neurological examination of Plaintiff in March 2002 in connection with her complaints of constant, bitemporal, occipital headache associated with photophobia and nausea but no loss of consciousness, as well as depression and stress. She reported a suicide attempt in 1996; she denied the use of alcohol and drugs. She was taking Motrin, Trazodone, and a hormone patch. Dr. Katzenberg found Plaintiff had a normal physical examination and no neurologic deficits (Tr. 234-235). She was awake, alert, and oriented; and she demonstrated fluent speech and intact naming and repetition. The impression was that Plaintiff had a headache, but there were no neurologic deficits; if the headaches were controlled, there would be no physical restrictions. Her disability was based on subjective head pain. Dr. Katzenberg assessed no physical restrictions, assuming Plaintiff's self-reported headaches were controlled (Tr. 235).

A treating source granted Plaintiff's April 2002 request that she be given a medical absence from work for one month, and it was noted that although Plaintiff had been unable to afford medications for depression, her depression was not worsening and possibly was improving. (Tr. 274). A request for another extension in June 2002 was not granted because Plaintiff had not

10

1   been seen for any treatment in over six months (Tr. 272).

2       State agency reviewing physician Marshall Gollub, M.D.,

3   opined in May 2002 that Plaintiff's physical allegations were

4   non-severe (Tr. 239-40).

5       In October 2002, treating physician Dr. Jeff Daley, M.D., a

6   family practitioner (Tr. 257), noted mild tenderness on

7   Plaintiff's left elbow which he treated with Ibuprofen (Tr. 264).

8   Dr. Daley noted Plaintiff's depression versus bipolar disorder

9   and social anxiety problems were treated with antidepressants

10  (Tr. 264). After this single visit, Dr. Daley diagnosed bipolar

11  disorder and generalized anxiety disorder based on clinical

12  findings summarized simply as "anxiety, depression" (Tr. 257).

13  Dr. Daley stated that Plaintiff's prognosis was good, although he

14  admitted he had insufficient time to know what response she would

15  have to medications and counseling (Tr. 257).

16      In December 2002, Dr. Daley also offered an opinion on

17  Plaintiff's physical condition, finding that due to mild left

18  elbow pain and rheumatoid arthritis that she could lift twenty

19  pounds frequently and ten pounds continuously, carry twenty

20  pounds frequently, sit, stand, or walk for eight hours daily,

21  never grasp or finely manipulate with her right hand, never use

22  her feet, only frequently crouch and kneel, and occasionally

23  crawl, and only frequently reach, handle, feel, push or pull.

24  (Tr. 257-60). Dr. Daley recommended she avoid concentrated

25  exposure to chemicals or noise due to her nervousness and

26  anxiety. (Tr. 261).

27      An intake at Stanislaus Behavioral Health Center in March

28  2003 revealed that Plaintiff was being evicted and as a result

had relapsed the previous night and had used methamphetamine after being clean for nearly two years. She had not used alcohol for one year. She felt she would be o.k. if she had a safe place to stay that evening. Her mood was depressed and tearful; she had suicidal thoughts but no intent. She was oriented; her memory was intact, her intelligence average, and her judgment and insight fair. The contact resulted in a nurse's diagnoses of depressive disorder and methamphetamine abuse with a Global Assessment of Functioning (GAF) of 50 (Tr. 277-78). She did not return for further assessment or treatment. (Tr. 278.)

Plaintiff's counsel submitted to the Appeals Council on March 22, 2004, additional medical records from the Stanislaus Behavioral Health Center dated March 19, 2003 through March 11, 2004. (A.R. 10-20.) The portion of the records not duplicative of previously submitted material constitutes assessments made in 2004 showing that Plaintiff complained of depression and sleep disturbance, took Effexor, Soma and Tylenol, and was diagnosed by a person with an illegible name with the initials "MFT" following the name as having major depression, amphetamine abuse with two years of sobriety, and a GAF of 45. (A.R. 18.) Plaintiff reported on January 14, 2004, that she had a history of noncompliance with medications and had not had prolonged, consistent psychiatric care, not having appeared for her clinic appointment in February 2003; she reported anxiety and euphoria as well as two-day periods of compulsive cleaning of her house; she exhibited some disorganization of thought process and some confusion. The diagnosis was bipolar II disorder, alcohol/amphetamine abuse in full sustained remission; the plan was to continue medication and

follow up at a psychiatric clinic in six weeks. (A.R. 14.-15.)

On February 24, 2004, Plaintiff reported to Dr. Denise Greene that since her intake in emergency services, she had been taking her medications and had slept almost continuously, felt less angry and distressed, but was feeling very sedated. She also reported that she took Zoloft and that it had leveled out her mood somewhat even though she did not feel as though this had helped her. Her hygiene was fair to good, mood and affect were congruent but somewhat somnolent and sedated, thought process and content were goal-oriented and linear, and there were no hallucinations or suicidal ideation. The diagnosis was alcohol dependence in full sustained remission, amphetamine dependence in full sustained remission, rule out bipolar disorder not otherwise specified, and rule out depressive disorder not otherwise specified. The plan was to increase the Zoloft dose, omit the Zyprexa to reduce somnolence, and monitor for the need for a mood stabilizer. (A.R. 16-17.)

On March 11, 2004, Dr. Greene's notes reflect that Plaintiff had discontinued Zyprexa, had slept, had not experienced any other manic or racing thoughts, rapid speech, impulsivity, etc. Her speech was within normal limits; thought process and thought content were goal-oriented and linear. The diagnosis was bipolar I disorder, MRE hypomanic, and alcohol and amphetamine dependency in full remission. The plan was to restart Zyprexa, continue Zoloft, and return in four weeks. (A.R. 13.)

III. Contact with Plaintiff's Landlord

Plaintiff's former landlord and roommate, Bambi Marquez, reported that Plaintiff had been at her home for thirteen months

until September 2, 2001, without paying any rent. Plaintiff was drinking a lot of tequila while she was there, and Marquez actually bought Plaintiff alcohol. Marquez speculated that Plaintiff spent the $42,000 profit from Marquez's sale of Plaintiff's home on alcohol and gambling, and possibly amphetamines (Tr. 248).

<u>SCOPE AND STANDARD OF REVIEW</u>

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971), but less than a preponderance, <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th

14

Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

<u>ANALYSIS</u>

I. <u>Disability</u>

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to

return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520 (1997);[3] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

With respect to SSI, the five-step evaluation process is

---

[3] All references are to the 2003 version of the Code of Federal Regulations unless otherwise noted.

essentially the same. <u>See</u> 20 C.F.R. § 416.920.

II. <u>Plaintiff's Subjective Complaints</u>

Plaintiff argues that the ALJ failed to state clear and convincing reasons for discrediting Plaintiff's testimony regarding her subjective complaints.

The existence and severity of a person's reaction to a physical ailment, such as the existence and severity of pain, are subjective phenomena, the extent of which cannot be objectively measured. <u>Byrnes v. Shalala</u>, 60 F.3d 639, 642 (9th Cir. 1995). In order to reject a claimant's subjective complaints, the ALJ must provide specific, cogent reasons for the disbelief. <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995). Once the claimant introduces medical evidence of an underlying impairment that could reasonably be expected to produce some degree of the subjective symptoms, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence such as objective medical findings. <u>Id.</u>; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996). Unless there is affirmative evidence tending to show that the claimant is malingering, the reasons for rejecting the claimant's testimony must be clear and convincing, and the ALJ must set forth the rejection by identifying what testimony is not credible and what evidence undermines the claimant's complaints. <u>Lester v. Chater</u>, 81 F.3d at 834. The findings of the adjudicator must be properly supported by the record and must be sufficiently specific to allow a reviewing court to conclude that the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony.

Bunnell v. Sullivan, 947 F.2d 341, 345-46; Byrnes v. Shalala, 60 F.3d at 641-42 (9th Cir. 1995); see 20 C.F.R. § 404.1529(c) [disability] and 20 C.F.R. § 416.929(c) [supplemental security income].

Social Security Ruling 96-7p directs the adjudicator to consider not only objective medical evidence of signs, laboratory findings, and medical opinions, but also the following factors when assessing the credibility of an individual's statements:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and adverse side effects of any medication for pain or other symptoms;
5. Treatment, other than medication, for relief of pain or other symptoms;
6. Any measures other than treatment used by the individual to relieve the pain or other symptoms; and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

See also Bunnell v. Sullivan, 947 F.2d at 346.

The ALJ expressly considered Plaintiff's allegations that she was unable to work due to arthritis, depression, and anxiety. (A.R. 34.) He expressly concluded that Plaintiff's allegations, in addition to those of her landlord and friend, concerning her impairments and their continued impact on her ability to work were somewhat, but not entirely, credible in light of the discrepancies between the assertions and the reports of the treating and examining doctors. (A.R. 35.)

The ALJ reviewed her July 2001 and January 2002 daily activities questionnaires and a fatigue questionnaire in which she claimed to have mental problems such that she would generally

18

watch TV and sleep, could not stay focused or follow written
instruction, could not concentrate when using her computer,
became angry because she would not finish what she had started,
and was afraid to be around people. However, he noted her own
admissions as well as information from others that she groomed
herself, cooked, did grocery shopping, cleaned, did laundry,
talked to her friend and brother on the computer, played computer
games, enjoyed playing with her dog, and visited her father or
friends a couple of times a week. (A.R. 34-35.)

A claimant's ability to engage in activities of daily living
to the extent that he or she spends a substantial part of her day
engaged in pursuits involving the performance of functions that
are transferable to the work setting is relevant; a specific
finding as to this fact may be sufficient to discredit a
claimant's allegations. Morgan v. Commissioner of Social Sec.
Admin., 169 F.3d 595, 600 (9th Cir. 1999); Thomas v. Barnhart,
278 F.3d 947, 959 (9th Cir. 2002). Substantial evidence supported
the ALJ's finding that Plaintiff demonstrated independence in her
activities of daily living; further, in the context of the entire
record before the Court, this reason was of clear and convincing
force.

The ALJ rejected Plaintiff's claim of psychological
limitation because the medical record contained significant
discrepancies. The ALJ noted Dr. House's psychological evaluation
that Plaintiff could maintain good concentration, persistence,
and pace. (A.R. 35.)

The ALJ recounted Plaintiff's claim of right arm and elbow
pain secondary to rheumatoid arthritis years ago, right leg

varicose veins, neck pain, headaches all the time, and loss of sleep. (A.R. 35.) The ALJ noted Plaintiff's claim of difficulty sleeping because of sleep apnea, chronic bronchitis, and headaches. (A.R. 34.)

The ALJ also expressly noted that the treatment record was "completely at odds with the constellation of complaints." (A.R. 35.) As to Plaintiff's claim of disabling headaches, he noted that there were no treatment notes after June 2000 indicating severe and persistent headaches.[4] As to her mental condition, the evidence of treatment was sparse (methamphetamine relapse in February 2001 and seen again in October 2001). He also noted that she had reported that she was better on Paxil in March 2001. (Id.) It is appropriate to consider the inconsistency of a documented improvement with claims of constant symptoms. Morgan v. Commissioner, 169 F.3d 595, 599 (9th Cir. 1999).

With respect to her pain, the ALJ noted that the medication list was not overly impressive; further, there was no indication of attempts to use a TENS unit or perform any home exercises. The ALJ also noted that Plaintiff's complaints of headaches did not support a finding of disabling extent. (A.R. 35-36.)

It was appropriate for the ALJ to consider the lack of objective indicia of Plaintiff's impairments, including lack of objective clinical findings, inconsistent activities of daily living, use of conservative treatment, extent of efforts to obtain relief, and effectiveness of medications in controlling

---

[4] Defendant notes that although Plaintiff argues that she could not afford treatment, Plaintiff saw her treating physician seven times in 2001 and each time related subjective complaints, but did not complain of debilitating headaches. (A.R. 225-33.)

the symptoms. Soc. Sec. Ruling 96-7p and 20 C.F.R. §
416.929(c)(4)(1)(vii); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th
Cir. 1996); <u>Bunnell v. Sullivan</u>, 947 F.2d at 346 (9th Cir. 1991).
These reasons were clear and convincing and were supported by
substantial evidence in the record.

It is established that failure to seek treatment because of
inability to pay is not a legitimate, let alone a clear and
convincing, reason for determining that a claimant is not
disabled. <u>Gamble v. Chater</u>, 68 F.3d 319, 321 (9th Cir. 1995).
Even if some of Plaintiff's limited treatment was due to lack of
resources, the record does not preclude an inference that
Plaintiff was also noncompliant. Separate and apart from the
extent of Plaintiff's treatment, the record did contain evidence
of her failure to show for appointments and her failure to
attempt to obtain even relatively inexpensive or available
treatment. (A.R. 269, 270.)[5]

The ALJ also relied on inconsistencies in Plaintiff's claims
and reports. (A.R. 34-35.) The ALJ noted that Plaintiff responded
in a fatigue questionnaire in January 2002 that she did not take
walks. (A.R. 138.) However, her landlord noted that she took her
dog for walks. (A.R. 126.) Further, although Plaintiff reported
that she never talked to relatives on the telephone (A.R. 121),
her landlord indicated that her brother called her weekly (A.R.
127). Included in the factors that an ALJ may consider in
weighing a claimant's credibility are the claimant's reputation
for truthfulness; inconsistencies either in the claimant's

---

[5] The Court finds that the ALJ also stated other independent reasons for his credibility findings that were arrived at pursuant to correct legal principles and were supported by substantial evidence.

21

testimony or between the claimant's testimony and the claimant's conduct, daily activities, or work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's testimony is believable or not. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999).

Finally, the ALJ repeatedly relied on the medical evidence of record, concluding that it was inconsistent with the disabling extent of symptoms claimed by Plaintiff. The ALJ noted that Plaintiff had not been shown to have marked restrictions of activities of daily living, maintaining social functioning, and deficiencies of concentration, persistence, or pace or repeated episodes of decompensation. The ALJ rejected the state agency psychological examiner's contrary opinion because Dr. Gottschalk's determinations reflected Plaintiff's abilities when she was severely abusing drugs or alcohol, and because the doctor expressly concluded that Plaintiff could perform simple routine tasks or more if free of drug addiction or alcoholism. (A.R. 33.) The fact that an opinion is based primarily on the patient's subjective complaints may be properly considered. Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Where an opinion is based largely on the Plaintiff's own subjective description of his or her symptoms, and the ALJ has discredited the Plaintiff's claim as to those subjective symptoms, the ALJ may reject the medical source's opinion. Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

The ALJ expressed another legitimate and probative reason

for rejecting Gottschalk's more limiting assessments, namely, Gottschalk's ignoring of the findings in Dr. House's month-old report that Plaintiff had the ability to maintain good concentration, persistence, or pace. (A.R. 33.)

As to Plaintiff's headaches, the ALJ reviewed the medical evidence of record, which consisted of Plaintiff's reports of June 2000 of blurred vision and headache following a fainting spell, a CT scan showing no intracranial abnormality but reflecting ethmoid sinusitis, and a finding of minor closed head injury; and the March 2002 consulting exam revealing normocephalic and atraumatic head, intact sensation, power of 5/5 throughout, and effortless gait, heel, toe, and tandem walking, with an impression of a headache. The ALJ expressly placed great weight on Dr. Katzenberg's findings of no neurologic deficits and lack of physical restrictions if Plaintiff's headaches were controlled because they were medical findings by a board-eligible neurologist on examination of the plaintiff. This is a legitimate reason for crediting the report. More weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. § 404.1527(d)(5); 20 C.F.R. § 416.927(d)(5).

The ALJ correctly noted that although there was a diagnosis of headaches, symptomatology in itself did not constitute an impairment; the clinical findings of normal gait, intact sensation, and lack of radiological evidence warranted a finding that Plaintiff suffered no functional limitation. (A.R. 36.)

With respect to Plaintiff's bronchitis or sinusitis, the ALJ

23

reviewed treatment records from December 2001 showing several days' congestion and bronchitis treated with Albuterol, noting the absence of a demonstration of any impairment of the requisite duration. (A.R. 35)

The Court concludes that the ALJ cited clear and convincing reasons for rejecting Plaintiff's subjective complaints of pain to the extent alleged, and that the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony. The fact that there was contradictory medical evidence in the record or contradictory testimony by Plaintiff did not require the ALJ to conclude that Plaintiff's claims of disabling impairments were true. To the extent that medical evidence is inconsistent, conflicting, or even ambiguous, it is the responsibility of the ALJ to resolve any conflicts and ambiguity. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999); the Court must defer to the ALJ's decision where it is made in accordance with the governing legal standards and is supported by substantial evidence. Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993).

III. Reports of Third Parties

Plaintiff points to third party information, including landlord Bambi L. Marquez's responses in a daily activities questionnaire dated July 9, 2001, indicating that Plaintiff was generally sleepy, depressed, forgetful, distrustful of others, and preferred to be alone and to remain awake at night, sometimes for two days, and then to sleep for two days; Plaintiff did

pretty well caring for herself, although her grooming and social contacts had declined; and she did household chores without help, walked her dog in the cemetery in the evening and took pictures of a lot of the old headstones, had a driver's license, watched TV, did not finish things, talked to her brother weekly and to a friend who visited, and cared for her small dog. (A.R. 124-29.) Plaintiff also notes the third party questionnaire of William L. Cook, Plaintiff's friend from Sonora, whose information was less complete but generally consistent. Cook noted that she suffered sleep apnea, chronic bronchitis, and acute headaches; she played computer games, sent e-mails to Cook and a brother, and drove a car; she seemed to have a speech problem or inability clearly to articulate. (A.R. 139-44.)

Plaintiff asserts that the ALJ erroneously discredited Cook's and Marquez's input.

Lay witnesses, such as friends or family members in a position to observe a claimant's symptoms and daily activities, are competent to testify to a claimant's condition; the Commissioner will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work. Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993). An ALJ cannot discount testimony from lay witnesses without articulating specific reasons for doing so. Id. at 919.

Here, the ALJ expressly stated:

> Any third party reports are suspect secondary to the credibility problem. In addition, the claimant may well be portraying herself in a limited light for reasons other than a genuine impairment at Step #2 of the sequential evaluation process.

(A.R. 35.) Thus, the ALJ made an express finding, and he gave a

reason that was germane to the witnesses, namely, that Plaintiff herself was not credible with respect to what her true capacity was, and thus third party evidence based on observation of Plaintiff was likewise of questionable crediblity. As the previous analysis demonstrates, the ALJ appropriately rejected Plaintiff's credibility.

Thus, the Court concludes that the rejection of third parties' input was accomplished in accordance with correct legal standards and was supported by substantial evidence.

IV. Rejection of Dr. House's Opinion

Plaintiff argues that the ALJ's rejection of the opinion of Dr. House, the consulting, examining physician, and his adoption of portions of the opinion of Dr. Gottschalk were not supported by substantial evidence.

The opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The uncontradicted opinion of an examining physician may be rejected only if the Commissioner provides clear and convincing reasons for rejecting it. Id.; Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir. 2001). An ALJ can reject the opinion of an examining physician and adopt the contradictory opinion of a nonexamining physician only for specific and legitimate reasons that are supported by substantial evidence in the record. Moore v. Commissioner of Social Security Administration, 278 F.3d 920, 925 (9th Cir. 2002) (quoting Lester v. Chater, 81 F.3d at 830-31).

Here, the ALJ concluded that Plaintiff's mental condition was not disabling by relying on a history of sporadic treatment

for depression with medications such as Paxil from June 2000 through January 2001; Plaintiff's drug relapse and in-patient treatment with medication in February 2001, which resulted in findings upon discharge several days later that Plaintiff was substantially improved, in good spirits, and motivated to return to work; reports of improvement when off Paxil and treated with Trazodone and Propranolol from March to May 2001; Plaintiff's failure to keep her appointments or follow up; treatment with Prozac in July 2001; the clinical <u>findings</u> of the examining, consulting psychologist, Dr. House, in September 2001 (normal and productive speech with appropriate verbalization and concrete narrative; linear stream of mental activity; organized thinking; depressed thought content; a score of twenty-six out of thirty on a mental status exam, reflecting intact cognitive functioning with no evidence of impairment in memory, concentration, or attention; good insight into her problems and good concentration and attention; ability to maintain good concentration, persistence, and pace; average intellectual level without evidence of a significant cognitive impairment or disorder of thought; and intact memory functions for immediate, recent, and remote events); and the opinion of Dr. Gottschalk, the state agency consultant, that Plaintiff could perform simple repetitive tasks and more if she were not abusing drugs or alcohol. (A.R. 37-38.)

The ALJ gave weight to the determinations of Dr. House because they were based on findings by a licensed psychologist on examination. (A.R. 38.) However, he rejected Dr. House's opinion with respect to Plaintiff's RFC or functional limitations because

1  it was inconsistent with Dr. House's own medical findings. (<u>Id.</u>
2  at 38-39.) The record supports this conclusion because Dr.
3  House's opinion of difficulty performing simple and repetitive
4  tasks, accepting instructions, interacting with others, or
5  maintaining regular attendance was inconsistent with the findings
6  that he made simultaneously. It is appropriate for an ALJ to
7  consider the absence of supporting findings, and the
8  inconsistency of conclusions with the physician's own findings,
9  in rejecting a physician's opinion. <u>Johnson v. Shalala</u>, 60 F.3d
10 1428, 1432-33 (9th Cir. 1995); <u>Matney v. Sullivan</u>, 981 F.2d 1016,
11 1019 (9th Cir. 1992); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th
12 Cir. 1989).

13      The ALJ also reasoned that the opinion that Plaintiff could
14 not perform even unskilled work was "fraught with problems
15 secondary to the credibility determination made above." (A.R.
16 39.) This was consistent with the ALJ's rejection of Plaintiff's
17 credibility and is a permissible basis for rejecting an opinion.
18 Where an opinion is based largely on the Plaintiff's own
19 subjective description of his or her symptoms, and the ALJ has
20 discredited the Plaintiff's claim as to those subjective
21 symptoms, the ALJ may reject the medical source's opinion. <u>Fair</u>
22 <u>v. Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989).

23      Noting the credibility problem, the ALJ rejected Dr. House's
24 opinion regarding Plaintiff's functionality and relied on the
25 opinion of state agency physician Dr. Gottschalk, who concluded
26 that Plaintiff could work in coordination with or in proximity to
27 others without distraction and would not be significantly limited
28 in her ability to understand, remember, and carry out simple and

detailed instructions; further, she was only mildly restricted in activities of daily living and could perform simple, routine tasks or more if not severely abusing drugs or alcohol for a year. (A.R. 39.) This was appropriate.

The ALJ rejected Dr. Gottschalk's conclusion that Plaintiff met Listing 12.09 for substance addiction disorders, reasoning that although Plaintiff had relapsed in February 2001, there was no evidence that Plaintiff had relapsed again, and thus any limitations secondary to methamphetamine were not of sufficient duration. (A.R. 39.) Again, this is supported by the record.

The ALJ gave only some weight to Dr. Gottschalk's determinations because they were not entirely consistent with the objective medical evidence of record. The record supports the ALJ's reasoning (A.R. 39) that Dr. House's findings, made in the previous month, were inconsistent with an opinion that Plaintiff was unable to concentrate. Further, the ALJ put less weight on Dr. Gottschalk's opinion of limited functioning because Plaintiff did not have a severe impairment relative to drug addiction and alcoholism, and thus determinations reflecting Plaintiff's functional limitations when she was abusing drugs or alcohol were entitled to less weight. The ALJ thus credited Gottschalk's opinion of October 2001 that Plaintiff, if free from drug addiction and alcoholism for one year, would be only mildly to moderately limited in the ability to maintain attention and concentration for extended periods, complete a normal workday and week without interruptions, interact appropriately with others, not be significantly limited in her ability to understand, remember, and carry out simple and detailed instructions, and

even be able to carry out moderately complex instructions,
respond to supervisors, public and coworkers, and adapt
reasonably to work changes. (A.R. 40.) The ALJ further noted that
these findings were consistent with the evidence of record, which
was devoid of evidence that Plaintiff had not been free of drug
and alcohol abuse for a year, and they reflected claimant's
present functional abilities. (A.R. 40.)

Plaintiff argues that there is no substantial evidence to
support the ALJ's implicit conclusion that Dr. House' opinion
would have changed had Plaintiff been sober. However, all that is
required is that there be substantial evidence supporting the
ALJ's conclusion, which was in essence that the assessment of
Plaintiff limitations was inconsistent with the medical findings
and weakened by reliance on inaccurate, subjective reporting by
Plaintiff. Substantial evidence supports these legitimate and
specific reasons.

The ALJ put weight on Dr. Gottschalk's opinion because the
doctor had a great understanding of the SSA disability programs
and their evidentiary requirements and thus was very qualified to
make such assessments. (A.R. 40.) It is appropriate to consider
factors that tend to support or contradict the opinion, such as
the extent the source understands the disability programs and
their evidentiary requirements, and the extent to which an
acceptable medical source is familiar with the other information
in the case record. 20 C.F.R. § 404.1527(d)(6); 20 C.F.R. §
416.927(d)(6).

Gottschalks' opinion was stated ambiguously as a range of
not significantly limited to moderately limited indicated with

arrows (A.R. 207-08); it was appropriate for the ALJ to resolve the ambiguity and interpret the evidence as consistent with the mild or insignificant limitations ultimately found.

Dr. Gottschalk's opinion that Plaintiff would be mildly to moderately limited supported the ALJ's ultimate conclusion because evidence of mild to moderate limitations does not compel a finding of disability. 20 C.F.R. § 416.920a(c), (d).

The Court concludes that the ALJ's reasons were specific, legitimate, and supported by the record.

V. Dr. Katzenberg's Opinion

Plaintiff argues that the medical record did not demonstrate that Plaintiff's headaches were controlled, and thus the evidence precludes reliance on Dr. Katzenberg's opinion that Plaintiff would not be disabled if her headaches were controlled.

The ALJ expressly assigned significant weight to Dr. Katzenberg's opinion of Plaintiff's functional limitations. (A.R. 36.) The ALJ surveyed the normal clinical findings and absence of neurologic deficit; noted that headaches were not mentioned consistently enough to warrant a finding that they would prevent work; and in effect concluded that Plaintiff's headaches would not prevent work. (A.R. 36.) Implicit in this analysis is a finding that the headaches were not as Plaintiff reported them to Dr. Katzenberg, and thus Dr. Katzenberg's conditional assessment of no functional limitations was adopted. As previously noted, substantial evidence supported the rejection of Plaintiff's subjective complaint of constant, severe headaches.

VI. Dr. Daley's Opinion

Plaintiff assigns error to the ALJ's rejection of Dr.

31

Daley's opinion because he was a caring doctor who listened to his patient. (A.R. 40.) The ALJ gave no significant weight to Dr. Daley's opinion, based on clinical findings of mild left elbow pain and rheumatoid arthritis, that Plaintiff had various limitations upon grasping, use of the feet, and various postural and manipulative limitations. The ALJ reasoned that the opinion 1) was not consistent with the objective medical evidence of record, including Dr. Katzenberg's opinion of no physical restrictions if her headaches were controlled; 2) was unsupported by any radiological evidence demonstrating arthritis or any other objective medical evidence; and 3) was internally inconsistent. Further, the ALJ explained that he had found credibility to be a problem in the case, and thus any report based, if only in part, on subjective complaints was suspect. (A.R. 40-41.) These reasons find substantial evidentiary support in the record and are sufficiently legitimate and specific to warrant the ALJ's conclusion. The remark concerning Dr. Daley's being a kind and caring physician who believed his patient was a preface to the ALJ's credibility reasoning and is reasonably interpreted as meaning that his opinions were based on subjective complaints that were unreliable and had been discounted by the ALJ.

VI. <u>Multiple Impairments</u>

Plaintiff argues that the ALJ did not consider all her impairments in combination. Her articulation of this argument is that the ALJ did not consider the effect of Plaintiff's physical impairments when combined with her mental impairments, which Plaintiff asserts, without further argument, would equal listing 12.04, concerning affective disorders.

Preliminarily the Court notes that Plaintiff has not met her burden before this Court of articulating her contention. One who claims upon review that the ALJ erred in not determining and finding that a claimant's combined impairments met a listing must offer a theory of how the impairments combined to equal a listed impairment and point to evidence that shows that his combined impairments equal a listed impairment. Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001).

In this case the ALJ expressly concluded that Plaintiff's depression did not meet the requirements under listing 12.04. The ALJ rejected restrictive functional assessments from the mental health sources to the extent that they were determined to have been influenced by Plaintiff's abuse of alcohol and/or drugs; he further concluded that she did not have a severe impairment relative to drug addiction and alcoholism. The ALJ noted the factors present in Plaintiff's allegations that might indicate a listed impairment, including anhedonia, decreased energy, sleep disturbance, and thoughts of suicide. (A.R. 33; compare Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(A).) However, he rejected those allegations based on his interpretation and evaluation of the medical evidence, which has been previously examined and found to have been undertaken pursuant to correct legal standards and to have been supported by substantial evidence. (A.R. 33.)

The ALJ determined that Plaintiff did not have marked restrictions of activities of daily living, maintaining social functioning, deficiencies of concentration, persistence or pace, or repeated episodes of decompensation, each of extended

duration. (Id.) Again, his reasoning and the evidence supporting it have been reviewed hereinabove. Thus, the criteria under listing 12.04(B) were determined not to have been met by Plaintiff.

Finally, the ALJ expressly concluded that Plaintiff's depression did not meet the requirement of any of the "C" criteria of listing 12.04 because there were no repeated episodes of decompensation of extended duration, no residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to compensate, and no current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of the continued need for such an arrangement. (A.R. 33.) Again, the evidence supports the ALJ's findings.

As to a combination of impairments, the Ninth Circuit Court of Appeals has cautioned that despite its holding in Celaya v. Barnhart, 332 F.3d 1177, 1181 (9th Cir. 2003), it remains the burden of a claimant to furnish evidence that her impairments, in combination, caused functional limitations. Burch v. Barnhart, 400 F.3d 676, 681-83 (9th Cir. 2005). Plaintiff does not point to evidence or suggest a theory pursuant to which the combined effects of her impairments would equal listing 12.04.

VII. Failure to Call a Vocational Expert

Plaintiff argues that because she had significant non-exertional limitations, it was erroneous for the ALJ to rely upon the guidelines and to fail to call a VE. Plaintiff contends that a VE was necessary because the limitation to unskilled work did

not address the nonexertional limitations of mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence or pace.

Relying on Dr. Gottschalk's assessment, the ALJ concluded that despite her depression and anxiety, Plaintiff had no more than moderate limitations in her abilities to maintain attention and concentration for extended periods, complete a normal workday and week without interruptions, and interact appropriately with the public and coworkers; further, she could work in coordination with others without distraction, and she was not significantly limited in her ability to understand, remember, and carry out simple and detailed instructions. (A.R. 40.) Her bronchitis was expressly found not severe (A.R. 33); her headaches were found not to be an impairment and/or not to be such as would prevent work (A.R. 36); and any physical functional limitations alleged to have resulted from her arthritis were rejected (A.R. 40-41). The ALJ concluded as follows:

> Accordingly, the undersigned finds the claimant retains the following residual functional capacity: to perform unskilled work at all exertional levels. She has mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild deficiencies of concentration, persistence or pace, and no indication that she had ever had an episode of decompensation of extended duration, except for drug relapses.

(A.R. 41.) He concluded that Plaintiff could not perform her past relevant work of bartending because it was semi-skilled work, and not unskilled work; she was a person who was fifty years old and thus closely approaching advanced age at the time of decision, and a younger individual at the alleged date of onset, with a

high school-equivalent education or more and no transferable skills from any past relevant work, with transferability not being an issue. Pursuant to § 204.00 of the medical-vocational rules, a finding of not disabled is appropriate if a claimant's non-exertional limitations do not significantly compromise the ability to perform work at all levels. The ALJ concluded that Plaintiff's non-exertional limitation of performing unskilled work did not preclude or significantly compromise her from performing work at all exertional levels, and pursuant to § 204.00, Plaintiff was not disabled and could perform a significant number of jobs in the economy. (A.R. 42-43.)

It is the Defendant's burden to show that Plaintiff could perform other work existing in significant numbers in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). Defendant may meet this burden either by obtaining the opinion of the VE or by relying on the medical-vocational guidelines (the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2), which constitute administrative notice of the existence of jobs for persons with specified limitations. Id. at 1099. When the grids are applicable, the Secretary may obtain a directed conclusion of nondisability and may take administrative notice that jobs exist in the national economy that a claimant can perform. Heckler v. Campbell, 461 U.S. 458, 461-462 (1983). The guidelines may only be applied when they accurately reflect a claimant's limitations. Desrosiers v. Secretary of Health & Human Services, 846 F.2d 573, 576-77 (9th Cir. 1988). If a nonexertional limitation significantly limits the range of work one can perform, mechanical application of the

grids is inappropriate, and a VE is required. Tackett v. Apfel, 180 F.3d 1194, 1102 (9th Cir. 1999).

Where nonexertional limitations are found not to significantly limit a claimant's exertional capacity, then use of the grids is appropriate. Razey v. Heckler, 785 F.2d 1426, 1430 (9th Cir. 1986), as amended, 794 F.2d 1348 (where substantial evidence supported the agency's conclusion that the claimant's generalized anxiety disorder did not prevent him from engaging in the work that he was physically able to do, use of the grids was appropriate); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (where substantial evidence supported the finding that the claimant's non-exertional impairments of deafness, dizziness, and drug dependence did not significantly limit his exertional capacities, use of the grids was appropriate, and no finding as to specific jobs was required).

Here, substantial evidence supported the finding that the conditions that limited Plaintiff to unskilled work did not significantly limit Plaintiff's exertional capacity. The ALJ's decision is reasonably interpreted as indicating that Plaintiff's limitations were sufficiently mild to be insignificant; Plaintiff was capable of performing unskilled work at all exertional levels.[6]

A skill is defined as knowledge of a work activity which, in addition to requiring more than thirty days to learn, requires

---

[6] The RFC to perform work at the heavy level includes the capacity to perform work at lesser functional levels as well and represents substantial work capability for jobs in the national economy at all skill and physical demand levels. § 204.00. An impairment that does not preclude heavy work would not ordinarily be the primary reason for unemployment and is sufficient for a finding of not disabled, even though age, education, and skill level of prior work experience may be considered adverse. Id.

the exercise of significant judgment that goes beyond the
carrying out of simple job duties and is acquired through
performance of an occupation which is above the unskilled level.
20 C.F.R. §§ 404.1545(d) (DIB), 416.945(d) (SSI). Unskilled work
involves simple duties that can be learned on the job in a short
period of time, requires little or no judgment, and may or may
not require considerable strength. 20 C.F.R. § 404.1568(a) (DIB),
416.968(a) (SSI). Although there is no precise calibration of
skill levels that slight limitations would permit, simple job
duties are consistent with Plaintiff's mild or essentially
insignificant limitations of activities of daily living,
difficulties in maintaining social functioning, and deficiencies
of concentration, persistence or pace. Indeed, Dr. Gottschalk had
opined that Plaintiff mentally would be able to carry out some
moderately complex instructions, respond appropriately to
supervision, coworkers, the public, and adapt reasonably to
change in the work routine. (A.R. 209.) Where a person's only
impairment is mental, is not of listing severity, but does
prevent the person from meeting the mental demands of past
relevant work and prevents the transferability of acquired work
skills, the final consideration is whether the person can be
expected to perform unskilled work. The basic mental demands of
competitive, remunerative, unskilled work include the abilities
(on a sustained basis) to understand, carry out, and remember
simple instructions; to respond appropriately to supervision,
coworkers, and usual work situations; and to deal with changes in
a routine work setting. A substantial loss of ability to meet any
of these basic work-related activities would severely limit the

potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base. Soc. Sec. Ruling 85-15.

Because the ALJ appropriately concluded that Plaintiff's nonexertional limitation did not significantly limit the range of his work, the testimony of a VE was not required.

<u>DISPOSITION</u>

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on proper legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff Sherrie Miller.


IT IS SO ORDERED.

**Dated:    March 1, 2006**                     **/s/ Sandra M. Snyder**
icido3                                                   UNITED STATES MAGISTRATE JUDGE